**ONE FORD MUSTANG, VIN 1FAFP40471F207859, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 10–06–00128–CV.**

Court of Appeals of Texas, Waco.

July 18, 2007.

Micah C. Haden, Law Office of Micah C. Haden, Corsicana, for appellant.

R. Lowell Thompson, Navarro County Dist. Atty., Corsicana, for appellee.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

FELIPE REYNA, Justice.

Shannon Raye brings this appeal from an order forfeiting a Ford Mustang which was used in the commission of a narcotics crime. Raye contends in two issues that the judgment is erroneous because she established as a matter of law that: (1) she is the owner of the Mustang and did not know and should not reasonably have known of the acts giving rise to the forfeiture; and (2) the person arrested in the Mustang breached his contract with Raye for its purchase. We will reverse and render.

## Background

Raye purchased the Mustang which is the subject of this proceeding in May 2004. She signed a "contract of sale" with Chris Harris for the Mustang in March 2005.[1] According to the terms of the contract, Harris agreed to pay $7,500 for the car. He made a down payment of $1,000 and agreed to make twenty-one monthly payments of $300 and one payment of $200 for the remaining $6,500 owed. For her part, Raye agreed to maintain insurance on the car "for [the] duration of [the] contract."[2]

An Arlington police officer arrested Harris in July 2005 for possession of twenty-eight grams of methamphetamine. Harris was driving the Mustang at the time of his arrest. A Navarro County sheriff's deputy arrested Harris in October 2005 for possession with intent to deliver forty-two grams of methamphetamine. Harris was driving the Mustang on this occasion as well, and it was seized for forfeiture.

The State served Raye with notice of the forfeiture proceeding because she is the registered owner of the Mustang. Raye

---

**1.** The parties' contract is actually a form real estate sales contract which was modified to constitute a contract for the sale of an automobile. In the margin of the contract is a pre-printed notation identifying the document as a "Contract of Sale and Receipt of Earnest Money (with Title Advice)."

**2.** However, Deputy Stan Farmer testified that Harris carried the insurance for the Mustang, and a liability insurance card was admitted in evidence indicating that Harris did have coverage on the car. Raye likewise testified that Harris maintained liability insurance for the car.

filed a general denial, asserted the innocent-owner defense, and asserted a cross-claim against Harris for breach of their contract.

Harris failed to appear at the forfeiture hearing. The State called three witnesses: the Arlington police officer and two Navarro County sheriff's deputies. The police officer described Harris's Arlington arrest and testified on cross-examination that he had no knowledge that Raye was involved in any way with Harris's narcotics offense or had any knowledge of the offense.

Deputy Clint Andrews testified to the circumstances of Harris's Navarro County arrest. Deputy Andrews stated on cross-examination that he did not know Raye, that he was not aware of any involvement on her part in narcotics trafficking, that he had no evidence to suggest that she was involved in Harris's crime, and that there is nothing to suggest that she had knowledge that Harris was selling narcotics.

Deputy Stan Farmer also participated in Harris's arrest and the ensuing investigation. Deputy Farmer testified that Raye was the registered owner of the Mustang. He had learned of Raye's boyfriend Jared Coker through "narcotics information." To Farmer's knowledge, Coker had never been arrested for a narcotics crime. He had no information to indicate that Raye had ever been involved in narcotics trafficking or that she would have knowledge of any narcotics trafficking.

Raye testified that Coker negotiated the transaction with Harris for the sale of her car. Coker and she had lived together for

about ten years. In describing Coker's relationship with Harris, she characterized them as "acquaintances" rather than "good friends." She personally had seen Harris on only a few occasions. She understood the agreement with Harris to mean that she would maintain title to the car until he paid the purchase price in full. She thought Coker may have experimented with marihuana when he was younger but denied that he had "a methamphetamine problem" as far as she was aware. She did not know that Harris was involved in narcotics trafficking until a few days after his Navarro County arrest. Harris still owes her $4,500 under their contract.

## Forfeiture Statutes

Chapter 59 of the Code of Criminal Procedure authorizes the forfeiture of "contraband," which is defined as property used in the commission of various enumerated felonies and misdemeanors including any felony under Chapter 481 of the Health and Safety Code, commonly known as the Texas Controlled Substances Act.[3] *See* Tex. Code Crim. Proc. Ann. arts. 59.01(2)(B)(i), 59.02(a) (Vernon 2006).

Article 59.02(c) provides an innocent-owner defense to forfeiture which requires a person whose property has been seized for forfeiture to establish: (1) she acquired or perfected her ownership interest before or during the act or omission giving rise to forfeiture; and (2) she did not know and should not reasonably have known of that act or omission or that it was likely to occur at or before acquiring the ownership interest.[4] *Id.* art. 59.02(c)(1) (Vernon

---

**3.** Harris was arrested in Arlington for a violation of section 481.115 of the Health and Safety Code (possession of controlled substance listed in Penalty Group 1) and in Navarro County for a violation of section 481.112 of that code (possession with intent to deliver a controlled substance listed in Pen-

alty Group 1). *See* Tex. Health & Safety Code Ann. §§ 481.112, 481.115 (Vernon 2003).

**4.** Article 59.02 also provides an innocent-owner defense for a person who acquires ownership after the act or omission giving rise to the forfeiture but before the seizure of

2006); *$18,800 v. State*, 961 S.W.2d 257, 260 (Tex.App.-Houston [1st Dist.] 1997, no writ); *Bochas v. State*, 951 S.W.2d 64, 71 (Tex.App.-Corpus Christi 1997, writ denied).

## Standard of Review

■ A forfeiture proceeding under Chapter 59 is a civil *in rem* proceeding governed by the procedural rules applicable to civil trials and appeals generally. *See State v. Silver Chevrolet Pickup*, 140 S.W.3d 691, 692 (Tex.2004) (per curiam); *Hardy v. State*, 50 S.W.3d 689, 692 (Tex. App.-Waco 2001), *aff'd*, 102 S.W.3d 123 (Tex.2003); *see also* TEX.CODE CRIM. PROC. ANN. art. 59.05(a), (b) (Vernon 2006). Thus, the appropriate standard of review on appeal depends on which party had the burden of proof at trial. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241–42 (Tex. 2001); *Lifshutz v. Lifshutz*, 199 S.W.3d 9, 17–18 (Tex.App.-San Antonio 2006, pet. denied); *Hardy*, 50 S.W.3d at 692; *Beard v. Beard*, 49 S.W.3d 40, 54–55 (Tex.App.-Waco 2001, pet. denied).

■ The burden is on the owner to establish the innocent-owner defense by a preponderance of the evidence. TEX.CODE CRIM. PROC. ANN. art. 59.02(c); *$18,800*, 961 S.W.2d at 260; *Bochas*, 951 S.W.2d at 71. When the appellant asserts that there is no evidence to support an adverse finding on which she had the burden of proof, the standard of review has been traditionally stated thusly:

we construe the issue as an assertion that the contrary was established as a matter of law. We first search the record for evidence favorable to the finding, disregarding all contrary evidence. If we find no evidence supporting the finding, we then determine whether the contrary was established as a matter of law.

the property. *See* TEX.CODE CRIM. PROC. ANN.

*Beard*, 49 S.W.3d at 54–55 (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989) (other citations omitted)); *accord Dow Chem.*, 46 S.W.3d at 241; *Lifshutz*, 199 S.W.3d at 17–18; *Hardy*, 50 S.W.3d at 695; *$18,800*, 961 S.W.2d at 261.

However, the appropriate enunciation of this standard must be reconsidered in light of the Supreme Court's recent decision in *City of Keller v. Wilson*, 168 S.W.3d 802 (Tex.2005).

The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. Whether a reviewing court begins by considering all the evidence or only the evidence supporting the verdict, legal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.

*Id.* at 827.

■ Thus, consistent with *City of Keller*, a correct restatement of the appropriate standard of review is as follows:

When an appellant asserts that there is no evidence to support an adverse finding on which she had the burden of proof, we construe the issue as an assertion that the contrary was established as a matter of law. We first search the record for evidence favorable to the finding, disregarding all contrary evidence *unless a reasonable factfinder could not.* If we find no evidence supporting the finding, we then determine whether the contrary was established as a matter of law.

*See Dallas County Constable v. Garden City Boxing Club, Inc.*, 219 S.W.3d 613, 616 (Tex.App.-Dallas 2007, no pet.); *Sell-*

art. 59.02(c)(2) (Vernon 2006).

*ers v. Foster*, 199 S.W.3d 385, 392 (Tex. App.-Fort Worth 2006, no pet.).

### Ownership

Raye contends as part of her first issue that she established as a matter of law that she is the owner of the Mustang. The facts pertinent to Raye's interest in the Mustang are not in dispute. Rather, the parties' dispute centers on the legal conclusions to be drawn from those facts.

The court made the following findings of fact and conclusions of law regarding Raye's interest in the Mustang:

1. The evidence seems clear that the record title owner of the vehicle intended to sell and did sell the subject vehicle to the person from whom it was seized in connection with a narcotics case.

2. The evidence also discloses that the seller and buyer did not comply with the certificate of title act. The buyer made payments on the vehicle and seller apparently intended to retain a lien, but no lien was perfected as required by law.

3. While a certificate of title is presumptive evidence of ownership, it may be rebutted by competent evidence. The evidence in this case clearly discloses a sale from the record owner to the person from whom it was seized.

4. A lien upon a motor vehicle may be perfected *only* by compliance with the certificate of title act.

Based upon the foregoing, the Court finds that the vehicle was sold to Harris and that the seller, Ms. Raye failed to perfect her lien. The vehicle is forfeited and Ms. Raye is free to pursue her legal remedy, futile though it may be.

Thus, the court found that Raye did not own the Mustang but was a lienholder who had failed to perfect her lien. According-

ly, the court rendered judgment ordering the forfeiture of the Mustang. *See* Tex. Code Crim. Proc. Ann. arts. 59.01(4), 59.02(c) (Vernon 2006) (a lienholder's interest is not protected from forfeiture unless it is perfected); *State v. Southwind Auto Sales*, 951 S.W.2d 849, 852 (Tex.App.-San Antonio 1997, no pet.) (same).

In denying Raye's motion for new trial, the court also referred to the following language in the parties' contract: "Seller ... hereby sells and agrees to convey unto ... Purchaser" [the car]. This according to the court provided further support for its conclusion that Raye transferred ownership of the car to Harris when she delivered it to him.

■ For purposes of Chapter · 59, an "owner" is defined as "a person who claims an equitable or legal ownership interest in property." Tex.Code Crim. Proc. Ann. art. 59.01(6) (Vernon 2006). Under this statutory definition, there may be more than one "owner" for an article of property. *See Arnold v. State*, 793 S.W.2d 305, 308 (Tex.App.-Austin 1990, no writ).

The parties' dispute brings to light a conflict between the provisions of the Certificate of Title Act ("the Title Act") and the Uniform Commercial Code ("the UCC") regarding the transfer of title and ownership in a motor vehicle sale. This conflict has been discussed by several of our sister courts. *See, e.g., Vibbert v. PAR, Inc.*, 224 S.W.3d 317, 321–24 (Tex. App.-El Paso 2006, no pet.); *First Nat'l Bank of El Campo v. Buss*, 143 S.W.3d 915, 919–24 (Tex.App.-Corpus Christi 2004, pet. denied); *Arcadia Fin., Ltd. v. Southwest–Tex Leasing Co.*, 78 S.W.3d 619, 623–24 (Tex. App.-Austin 2002, pet. denied); *see also Tyler Car & Truck Ctr. v. Empire Fire & Marine Ins. Co.*, 2 S.W.3d 482, 485 (Tex.App.-Tyler 1999, pet. denied).

We begin with the Title Act. Section 501.002(16) of the Title Act defines an "owner" as "a person, other than a manufacturer, importer, distributor, or dealer, claiming title to or having a right to operate under a lien a motor vehicle that has been subject to a first sale."[5] TEX. TRANSP. CODE ANN. § 501.002(16) (Vernon 2007). Under the Title Act, a motor vehicle may not be sold "unless the owner designated in the certificate of title transfers the certificate of title at the time of the sale." *Id.* § 501.071(a) (Vernon 2007). A purported sale which does not comply with this requirement "is void and title may not pass until the requirements of this chapter are satisfied." *Id.* § 501.073 (Vernon 2007).

Thus, it is the general rule that ownership of a vehicle rests in the person(s) named in the certificate of title. However, "[t]he name on the certificate of title is not conclusive of ownership." *Vibbert,* 224 S.W.3d at 321; *accord Tyler Car & Truck Ctr.,* 2 S.W.3d at 485. And notwithstanding section 501.073, the sale of a vehicle may still be valid as between the buyer and seller even if they do not comply with the Title Act. *Phil Phillips Ford, Inc. v. St. Paul Fire & Marine Ins. Co.,* 465 S.W.2d 933, 937 (Tex.1971); *First Nat'l Bank of El Campo,* 143 S.W.3d at 919; *Tyler Car & Truck Ctr.,* 2 S.W.3d at 485.

Evidence that a party is the registered owner of a vehicle raises a presumption of ownership which is not "evidence" and which "vanishes when positive evidence to the contrary is introduced." *Vibbert,* 224 S.W.3d at 321; *Tyler Car & Truck Ctr.,* 2 S.W.3d at 485; *see also Sudduth v. Commonwealth County Mut. Ins. Co.,* 454 S.W.2d 196, 198 (Tex.1970) ("A true presumption is simply a rule of law requiring the jury to reach a particular conclusion in the absence of evidence to the contrary. The presumption does disappear, therefore, when evidence to the contrary is introduced, but the facts upon which the presumption is based remain in evidence and will support any inferences that may properly be drawn therefrom."); *accord Little v. Tex. Dep't of Criminal Justice,* 177 S.W.3d 624, 631–32 (Tex.App.-Houston [1st Dist.] 2005, no pet.); *Jean v. Tyson–Jean,* 118 S.W.3d 1, 6–7 (Tex.App.-Houston [14th Dist.] 2003, pet. denied).

By contrast, the UCC governs the sale of "goods" generally, which are defined therein as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Chapter 8) and things in action." TEX. BUS. & COM.CODE ANN. § 2.105(a) (Vernon 1994). Motor vehicles necessarily fit within this definition. *Assocs. Discount Corp. v. Rattan Chevrolet, Inc.,* 462 S.W.2d 546, 549 (Tex.1970); *Vibbert,* 224 S.W.3d at 322; *First Nat'l Bank of El Campo,* 143 S.W.3d at 920.

Section 2.106(a) of the UCC provides:

In this chapter unless the context otherwise requires "contract" and "agreement" are limited to those relating to the present or future sale of goods. "Contract for sale" includes both a present sale of goods and a contract to sell goods at a future time. A "sale" consists in the passing of title from the seller to the buyer for a price (Section 2.401). A "present sale" means a sale which is accomplished by the making of the contract.

---

**5.** By comparison, section 502.001(16) of the Title Act defines an "owner" as "a person who: (A) holds the legal title of a vehicle; (B) has the legal right of possession of a vehicle; or (C) has the legal right of control of a vehicle." TEX. TRANSP. CODE ANN. § 502.001(16) (Vernon 2007).

TEX. BUS. & COM.CODE ANN. § 2.106(a) (Vernon 1994).

Section 2.401 provides in pertinent part: (a) Title to goods cannot pass under a contract for sale prior to their identification to the contract (Section 2.501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this title. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the chapter on Secured Transactions (Chapter 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

(b) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading

(1) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but

(2) if the contract requires delivery at destination, title passes on tender there.

*Id.* § 2.401(a), (b) (Vernon 1994).

Finally, returning to the Title Act, section 501.005 provides, "Chapters 1–9, Business & Commerce Code, control over a conflicting provision of this chapter." TEX. TRANSP. CODE ANN. § 501.005 (Vernon 2007).[6]

In determining the respective rights of parties to vehicle transactions in which the parties did not comply with the terms of the Title Act, courts have uniformly held that the terms of the UCC control over the terms of the Title Act under section 501.005. *See Vibbert,* 224 S.W.3d at 324; *First Nat'l Bank of El Campo,* 143 S.W.3d at 923–24; *Hudson Buick, Pontiac, GMC Truck Co. v. Gooch,* 7 S.W.3d 191, 198 (Tex.App.-Tyler 1999, pet. denied); *but see Arcadia Fin.,* 78 S.W.3d at 624 (construing transaction in manner which rendered the issue of a conflict between the statutes moot).

■ We believe the approach taken in *Arcadia Financial* dictates the outcome in this case. Under section 2.401(b), title passes at the time a seller delivers goods to a buyer "[u]nless otherwise explicitly agreed." TEX. BUS. & COM.CODE ANN. § 2.401(b). Here, Raye testified that the parties agreed that title would not pass until Harris had made payment in full. *See Arcadia Fin.,* 78 S.W.3d at 624 ("Under the agreement between Lone Star and Advantage, no sale was completed until Advantage was paid in full. Thus, under the parties' agreement, Lone Star had not yet acquired ownership of the vehicles because it had not yet paid Advantage for them.").

Evidence that Harris had possession of the Ford Mustang at the time of his arrest, that he had negotiated an agreement to purchase it from Raye, and that he

---

**6.** The Legislature enacted the statutory predecessor to section 501.005 in 1971 in response to a 1970 Supreme Court holding that the terms of the Title Act controlled over the terms of the UCC. *See Hudson Buick, Pontiac, GMC Truck Co. v. Gooch,* 7 S.W.3d 191, 198 (Tex.App.-Tyler 1999, pet. denied).

maintained liability insurance for it constitutes some evidence that Harris has an ownership interest in the Mustang. However, it is no evidence that Raye does not also have "an equitable or legal ownership interest" in the Mustang. *See* Tex.Code Crim. Proc. Ann. art. 59.01(6); *see also Arnold,* 793 S.W.2d at 308 ("logic compels the conclusion that the term 'owner' cannot be construed to require sole ownership.").

■ We also examine the court's reliance on the peculiar language of the parties' contract which states in pertinent part, "Seller ... hereby sells and agrees to convey unto ... Purchaser" [the car]. As we have already observed, Raye and Harris used a form real estate sales contract which they modified to suit their purposes. Texas courts have for decades construed virtually identical contract language as evidencing an intent to make a future conveyance of real property rather than a present conveyance. *See, e.g., U.S. Enters., Inc. v. Dauley,* 535 S.W.2d 623, 624–25 (Tex.1976) (identifying contract with identical language as "written purchase contract"); *Bowles v. Fickas,* 140 Tex. 312, 167 S.W.2d 741, 742 (1943) ("contract of sale"); *Scott v. Vandor,* 671 S.W.2d 79, 82 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.) ("option contract" for sale of real property); *Ramsey v. Gordon,* 567 S.W.2d 868, 868–69 (Tex.Civ.App.-Waco 1978, writ ref'd n.r.e.) (contract to sell real property); *Noblitt v. Barker,* 97 S.W.2d 1010, 1010–11, 1014 (Tex.Civ.App.-San Antonio 1936, writ ref'd) (contract of sale).

At least one current Texas form book continues to endorse this language as appropriate for a real estate sales contract. *See* 1 Frank A. St. Claire, Texas Real Estate Guide § 3.200[2] (Matthew Bender & Co. 2007) ("Seller sells and agrees to convey, and Buyer purchases and agrees to pay for, the tract of land"); *but cf.* 1 James W. Adams, Jr., Texas Forms § 1:84,

at 246–47 (West 2000) ("Seller agrees to sell and convey to Purchaser and Purchaser agrees to purchase from Seller the following:"); 1 Real Estate Forms Comm., State Bar of Tex., Texas Real Estate Forms Manual Form 8–1, at 8–21 (July 2006) ("Seller agrees to sell and convey the Property to Buyer, and Buyer agrees to buy and pay Seller for the Property.").

The language endorsed by the State Bar's Real Estate Forms Committee is certainly more clear on the issue of whether the seller is making a present conveyance or agreeing to a future conveyance. However, we cannot disregard decades of uniform interpretation merely because a form has been updated. Therefore, we hold as a matter of law that the contract language at issue evidences an intent and agreement to make a future sale of the Mustang rather than a present sale. *Cf.* Tex. Bus. & Com.Code Ann. § 2.106(a) (" 'Contract for sale' includes both a present sale of goods and a contract to sell goods at a future time."). Thus, this contract language is no evidence that Raye does not have "an equitable or legal ownership interest" in the Mustang.

Having found that there is no evidence in the record to support the court's finding that Raye does not have "an equitable or legal ownership interest" in the Mustang, we now determine whether Raye established as a matter of law that she does have such an interest. *See Dow Chem.,* 46 S.W.3d at 241; *Dallas County Constable,* 219 S.W.3d at 616; *Sellers,* 199 S.W.3d at 392; *Lifshutz,* 199 S.W.3d at 17–18; *Hardy,* 50 S.W.3d at 695; *$18,800,* 961 S.W.2d at 261.

The State's witnesses and Raye all testified that she is the registered owner of the Mustang. Raye testified that Harris and she agreed that title for the car would not be delivered until he had paid in full. This evidence establishes as a matter of law

that Raye held legal title to the Mustang at the time it was seized. *See Arcadia Fin.,* 78 S.W.3d at 624; *Southwind Auto Sales,* 951 S.W.2d at 852–53; *see also Cadle Co. v. Harvey,* 46 S.W.3d 282, 286 (Tex.App.-Fort Worth 2001, pet. denied) (real estate sales contracts typically "provide that upon making a down payment, the buyer is entitled to immediate possession of the property, with the remaining purchase price paid in installments over a period of time. *Legal title, however, remains in the seller until the purchase price is paid in full.*") (emphasis added).[7]

### Knowledge of Narcotics Trafficking

Raye also contends as part of her first issue that she established as a matter of law that she did not know and should not reasonably have known that Harris was involved in narcotics trafficking.

The only affirmative evidence in the record on this subject is the virtually unanimous testimony of all witnesses that Raye did not know that Harris was involved in narcotics trafficking. Presumably because the court found that Raye was not an "owner" of the Mustang, the court did not make an express finding on the issue of Raye's knowledge. Nevertheless, the court did state during the hearing on Raye's request for additional findings of fact and conclusions of law, "I don't think there was any evidence to support she was actually involved in any contraband trafficking or anything like that."

The State suggests that, despite the virtually unanimous testimony of all the witnesses on this subject, the trial court was free to disbelieve this testimony and conclude that Raye did know or reasonably should have known of Harris's involvement in narcotics trafficking.

The State is correct that credibility determinations are left to the jury (or the court in a bench trial) which "may choose to believe one witness and disbelieve another." *City of Keller,* 168 S.W.3d at 819. "Jurors may disregard even uncontradicted and unimpeached testimony from disinterested witnesses." *Id.* at 820. However, " '[t]he jury's decisions regarding credibility must be reasonable.' Jurors cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *Id.* (quoting *Bentley v. Bunton,* 94 S.W.3d 561, 599 (Tex.2002)).

Here, the testimony of all the witnesses was "undisputed ... clear, positive, [and] direct" on the issue of whether Raye knew or reasonably should have known of Harris's involvement in narcotics trafficking. *See id.* Thus, the trial court was not free to disbelieve this testimony. *Id.*

We are well aware of the established principle that this Court may not interfere with the credibility determinations of a trial court. *See id.* at 819 ("Reviewing courts cannot impose their own opinions [on credibility] to the contrary."). However, in view of the court's "oral finding" and the undisputed testimony on the issue of Raye's lack of knowledge, it would not be "reasonable" for us to conclude that the trial court chose to disbelieve this evidence. *See id.* at 820; *but cf. In re Doe 10,* 78 S.W.3d 338, 340 n. 2 (Tex.2002) ("Oral comments from the bench are not written findings of fact."); *In re W.E.R.,* 669 S.W.2d 716, 716 (Tex.1984) (per curiam) (appellate court may not consider trial judge's oral comments as substitute for written findings); *In re E.A.S.,* 123

---

**7.** We cite *Cadle Co. v. Harvey* because, as stated above, Raye's contract with Harris was a real estate sales contract which had been converted to a contract for the sale of the Mustang.

S.W.3d 565, 569 (Tex.App.-El Paso 2003, pet. denied) ("Oral statements by the judge on the record will not be accepted as findings of fact.").

Therefore, we hold that Raye established as a matter of law that she did not know and should not reasonably have known that Harris was involved in narcotics trafficking. Accordingly, we sustain her first issue.

### Breach of Contract

■ Raye contends in her second issue that she established as a matter of law her cross-claim that Harris breached their contract and that she is entitled to a money judgment for the amount he still owes on the contract.

The contract provides that Raye may have as possible remedies for a breach either: (1) the right to retain the monies paid "as liquidated damages for the breach of this contract" or (2) the right to "enforce specific performance of this contract."

The court stated in its written findings of fact and conclusions of law, "[T]he Court finds that the vehicle was sold to Harris and that the seller, Ms. Raye failed to perfect her lien. The vehicle is forfeited and Ms. Raye is free to pursue her legal remedy, futile though it may be." It appears from this that the court concluded Raye would have to file a separate suit to enforce her contractual rights.

However, we have already rejected the trial court's interpretation of the contract. Rather, the evidence establishes as a matter of law that Raye and Harris had a contract for the future sale of the Mustang conditioned on Harris making payment in full. The evidence is undisputed that Harris failed to make payment in full and still owes $4,500 on the contract. Thus, Raye established as a matter of law that Harris

breached their contract. *See Runge v. Raytheon E–Sys., Inc.*, 57 S.W.3d 562, 565 (Tex.App.-Waco 2001, no pet.) (listing elements for breach of contract).

■ However, Raye seeks a remedy not provided by the contract (namely, Harris's payment of the remaining amount owed while Raye retains possession of the car). Rather, the contract provides that, in the event of a breach by Harris, Raye can (1) retain ownership of the car and retain the monies paid "as liquidated damages for the breach of this contract" or (2) "enforce specific performance of this contract." The remedy of "specific performance" would require Raye to transfer ownership of the car to Harris in exchange for payment of the remaining $4,500 owed. *See Brantley v. Etter*, 662 S.W.2d 752, 757 (Tex.App.-San Antonio 1983), *writ ref'd n.r.e.*, 677 S.W.2d 503 (Tex.1984) (per curiam).

Because Raye seeks a remedy not authorized by the contract, we overrule her second issue.

### Conclusion

We reverse the judgment and render judgment in favor of Raye for possession of the Ford Mustang.

Chief Justice GRAY dissenting.

TOM GRAY, Chief Justice, dissenting.

I would hold that the following testimony by Raye is some evidence that the only interest she retained was a feeble, ineffective, layperson's effort to retain a lien or security interest in the mustang.

Q. What did you do with the car?

A. It was sold to Chris Harris.

Q. Okay. And did you have an agreement with Mr. Harris about paying it out?

A. Yes.

* * *

Q. And did you have an agreement with him to transfer the title upon full payment?

A. Yes.

RR Vol. 2, pgs 25, 26.

She would not even claim an ownership interest.

Q. ... And are you the owner of a 2001 mustang?

A. My name is on the title.

RR Vol. 2, pgs 24–25.

She failed to comply with the law as it relates to perfecting her lien interest in the car her boyfriend sold for her. Her boyfriend's friend, the buyer—Harris— was a drug dealer. Harris was using the car to transport drugs and that makes *his* car contraband.

The easy way, the lawful way, for Raye to protect her interest was to comply with the law and perfect her security interest in the vehicle she "sold" (her term, not mine).

Instead, the majority of this Court makes holdings that could impact real estate transactions when they are here deciding a personal property forfeiture case. How? Because Raye, her boyfriend, and Harris used a form real estate contract to try to document the sale of the car, the note payment terms, and the security interest. But the payment terms are just that—nothing more and nothing less. And the attempt to keep a security interest was ineffective.[1]

In closing, I note that any question about whether Raye thinks she sold the car is foreclosed by her second issue. She wants the trial court (and now this Court)

to render a judgment for the balance due on the note.

I would affirm the judgment of forfeiture. Because the majority does not, I dissent.

---

1. The majority's holding may also have unexpected collateral consequences in criminal law as well. Under the majority's holding, could Reyes have resorted to self-help by repossessing the car for the default on the note or would that have been theft? *See Turner v. State,* No. 10–06–00055–CR, 2007 WL 475420, 2007 Tex.App. LEXIS 1115 (Tex. App.-Waco Feb. 14, 2007, no pet.) (mem.op.).